2002 UT App 267

**STATE of Utah, in the interest of J.B., a person under eighteen years of age.**

**E.B., Appellant,**

v.

**State of Utah, Appellee.**

**No. 20010260–CA.**

Court of Appeals of Utah.

Aug. 8, 2002.

Jeffrey J. Noland, Noland Law Office, Salt Lake City, for Appellant.

Mark L. Shurtleff, Attorney General, and Carol L. Verdoia, Assistant Attorney General, Salt Lake City, for Appellee.

Martha Pierce, Salt Lake City, Guardian Ad Litem.

Before BILLINGS, Associate P.J., and DAVIS, and GREENWOOD, JJ.

## OPINION

DAVIS, Judge:

¶ 1 Appellant E.B. (Mother) appeals the juvenile court's termination of her parental rights to J.B., claiming the court erred in relying upon facts from a previous termination proceeding involving J.B.'s older siblings. Mother also claims that the juvenile court erred by not considering Utah Code Ann. § 78–3a–409 (Supp.2001)[1] in making its determination. We affirm.

## BACKGROUND

¶ 2 Mother is the natural mother of six children: G.B., C.B., L.B., E.S.B., B.B., and J.B. The two older children, G.B. and C.B., are currently living in long-term foster care placements. Mother's parental rights to three of the children, L.B., E.S.B., and B.B.,

were terminated and today we have affirmed the juvenile court's ruling in that case in a separate opinion. *See In re G.B.*, 2002 UT App 270, 53 P.3d 963. The father, R.B., voluntarily relinquished his parental rights to the same three children and is not a party to the appeal from that proceeding. The father has filed a separate appeal from the termination proceeding involving J.B., which we have also affirmed today in a separate opinion. *See In re J.B.*, 2002 UT App 268, 53 P.3d 968.

¶ 3 This family has an extensive history with the Division of Child and Family Services (DCFS). Between December 1986 and November 1998, DCFS received approximately eighteen referrals for child abuse and neglect by the parents, at least ten of which were substantiated on grounds of sexual abuse, physical abuse, physical neglect, failure to protect, emotional maltreatment, and medical neglect. In 1996, the children were first placed in foster care after being adjudicated as neglected children. The children were returned home in November 1997.

¶ 4 On or about October 9, 1998, E.S.B. disclosed to her therapist that she recently had been sexually abused by a male friend of her parents who had been living with and caring for the children in their parent's home. Mother believed the friend would never do such a thing and told DCFS that she thought E.S.B. had made up the story. Because Mother refused to ensure that this friend would be kept away from E.S.B., the child was placed into shelter care. On October 13, 1998, the other four children were removed from the family home. At a shelter hearing, Mother again asserted her belief that E.S.B. had made up the story. The juvenile court ordered DCFS to return the children to their home that day. Prior to their return, however, the children were interviewed at the Children's Justice Center. During the interview, E.S.B. asserted that her siblings, C.B., L.B., and B.B., had also been sexually inappropriate with her. C.B. and L.B. admitted touching each other's and E.S.B.'s genitalia on a frequent or regular

---

1. For convenience, we cite to the most recent version of the statute. There has been no signifi-
cant change to the statute that would affect our analysis.

basis. Based on this new information, the children were not returned home, and instead were placed in shelter care.

¶ 5 At a hearing on October 16, 1998, the juvenile court granted temporary custody of the children to DCFS. Custody and guardianship was granted to DCFS on December 9, 1998, when the children were adjudicated abused and neglected by both parents. The two oldest children, G.B. and C.B., remain in foster care with long-term foster care as the permanency goal. L.B., E.S.B., and B.B. are in foster homes awaiting adoption.

¶ 6 Over the many years DCFS was involved with this family, the parents were provided with numerous services. These services included homemaking; nutrition; hygiene; parent advocacy; peer parenting; parenting classes; caseworker involvement; individual, couple, and family therapy; sex abuse treatment; handicapped and medical assistance; an attachment evaluation; psychological evaluations; visitation; Court-Appointed Special Advocate (CASA) support; transportation; and special education. In addition, ongoing family preservation services were provided since 1993.

¶ 7 The State filed a verified petition for termination of parental rights on August 13, 1999. Trial on the State's petition concluded on September 11, 2000.[2] Based on the evidence presented and the testimony given, the juvenile court found that Mother had neglected her children by failing to protect them from sexual activity among themselves. The court further found that because she was in the home when the majority of the acts involving her husband and children occurred, she had failed to protect them from sexual abuse by her husband.

¶ 8 The court also recognized that DCFS had provided numerous services to this family. However, because Mother was unable or unwilling to acknowledge the family's problems, they were of little benefit. Accordingly, on October 23, 2000, pursuant to Utah Code Ann. § 78–3a–407 (Supp.2001), the juvenile court terminated parental rights to

L.B., E.S.B., and B.B. based on grounds of unfitness, neglect, failure to remedy circumstances causing out-of-home placement, and best interest of the children.

¶ 9 The trial on the first petition to terminate Mother's parental rights concluded on September 11, 2000, and the final order was entered on October 23, 2000. On August 20, 2000, J.B. was born in the state of Idaho. Mother created a fictitious birth certificate which gave the child a different name and listed the names of Mother's friends as the natural parents of J.B. Mother concealed her pregnancy and the birth of J.B. during the course of termination proceedings regarding the older siblings.

¶ 10 DCFS learned of the birth of J.B. and began an investigation. When questioned, Mother told DCFS that she was babysitting J.B. for a friend who worked at night. Mother presented the false birth certificate to validate her story. DCFS visited the friend, who subsequently confessed to the deception. J.B. was removed from the parental home on or about October 17, 2000, as a child at risk under Utah Code Ann. § 78–3a–103(1)(r)(i)(E) (Supp.2001). Temporary custody and guardianship of J.B. was granted to DCFS at a shelter hearing held on October 30, 2000.

¶ 11 On November 13, 2000, the State filed its termination petition concerning J.B. and a trial was held on January 25, 2001. The State moved the court to take judicial notice of all prior proceedings, including the first termination findings and order pertaining to the older siblings. Mother and the father objected. The court heard argument and granted the motion, taking judicial notice of all prior proceedings involving the family.

¶ 12 Mother, the father, their friend B.R., and three DCFS caseworkers testified at the trial regarding J.B. Based on that testimony and the historical facts surrounding the parents' abuse and neglect of their older children, the juvenile court terminated Mother's and the father's parental rights to J.B. pur-

---

**2.** The father, who has filed a separate appeal, signed a petition to voluntarily relinquish his parental rights to three of the children—L.B., E.B., B.B.—on February 10, 2000. The petition

was stayed until the termination of Mother's parental rights became effective on October 23, 2000.

suant to Utah Code Ann. § 78–3a–407 by finding parental unfitness, failure to remedy circumstances causing out-of-home placement, token efforts, and best interest of the child.

¶ 13 Specifically, the court found that the parents did nothing to resolve their issues, modify their behavior, or correct the circumstances that caused them to lose custody of their five older children. The court further found that because J.B.'s siblings had been abused and neglected by his parents, he was at risk of abuse and neglect. Finally, the court found that J.B. was in an adoptive home where he was thriving and had bonded to his foster parents who desired to adopt him.

## ISSUES AND STANDARDS OF REVIEW

■ ¶ 14 Mother appeals the juvenile court's termination of her parental rights to J.B., claiming the court erred in relying upon facts from a previous termination proceeding involving J.B.'s older siblings.[3] We review the juvenile court's judicial notice of prior adjudicated facts under Rule 201 of the Utah Rules of Evidence for abuse of discretion. *See Riche v. Riche,* 784 P.2d 465, 468 (Utah Ct.App.1989).

■ ¶ 15 Mother also claims that the juvenile court erred in failing to apply Utah Code Ann. § 78–3a–409. This issue presents a mixed question of law and fact requiring a review of the juvenile court's application of statutory law to the facts. *See In re C.B.,* 1999 UT App 293,¶ 5, 989 P.2d 76. Findings of fact are reviewed for clear error, with deference given to the juvenile court. *See id.* Conclusions of law are reviewed by this court for correctness, giving no deference to the trial court. *See id.* However, we do afford the juvenile court some discretion in applying the law to the facts. *See id.*

## ANALYSIS

¶ 16 Mother first argues that the evidence relied upon by the juvenile court was insufficient because: (1) the court's findings of fact and conclusions of law regarding her unfit-

ness are based upon prior evidence and findings presented at the termination trial involving her older children, (2) during the second termination trial the State failed to meet its burden of presenting evidence regarding her then present circumstances, and (3) the court should not have relied on the prior unfitness findings relating to her older children because J.B. was not in her custody at that time.

■ ¶ 17 First, we address whether it was proper for the juvenile court to rely on previously adjudicated facts involving J.B.'s older siblings arising from proceedings in which Mother participated, and whether these findings, together with the evidence and findings from the J.B. termination proceeding, were sufficient to terminate Mother's parental rights. Under rule 201, judicially noticed facts are conclusively established in civil actions for purposes of the fact finding process, and a "party is entitled upon timely request to an opportunity to be heard as to the propriety of taking judicial notice and the tenor of the matter noticed." Utah R. Evid. 201(e). In addition, "[c]onsiderations regarding a child's welfare are rarely, if ever, static. In fact, it is more likely that the child's environment is constantly evolving, thus justifying the court's continuing jurisdiction." *In re J.J.T.,* 877 P.2d 161, 163 (Utah Ct.App. 1994); *see also In re A.S.,* 12 Kan.App.2d 594, 752 P.2d 705, 711 (1988) (holding that court must be free to examine all circumstances, evidence, prior facts and orders, and other relevant information in termination proceedings).

■ ¶ 18 Utah Code Ann. § 78–3a–407 provides that parental rights may be terminated if the juvenile court finds "that the parent or parents have neglected the child." Utah Code Ann. § 78–3a–407(2). A neglected child is defined as a minor "who is at risk of being a neglected or abused child ... because another minor in the same home is a neglected or abused child." Utah Code Ann. § 78–3a–103(1)(r)(i)(E). The very termination proceedings giving rise to the adjudicated facts relating to L.B., E.S.B., and B.B.

---

3. Today we affirm the termination order entered by the juvenile court in that proceeding. *See In re G.B.,* 2002 UT App 270, 53 P.3d 963.

were ongoing at the time of J.B.'s birth, obviating any need on the part of the State to negate their ongoing efficacy. Based on the prior adjudicated facts that J.B.'s older siblings were neglected, and applying the plain meaning of both sections of the Utah Code, we hold that it was proper for the juvenile court to find that J.B. was a neglected child.

¶ 19 Mother's next argument requires us to determine where the burden lies in cases where the State argues that a child is at risk of being neglected or abused because a sibling in the same home has been neglected or abused. *See* Utah Code Ann. § 78–3a–103(1)(r)(i)(E).

■ ¶ 20 Before a court can terminate parental rights it must make two distinct findings. *See In re M.L.*, 965 P.2d 551, 561 n. 13 (Utah Ct.App.1998). "First, the court must find that the parent is below some minimum threshold of fitness." *In re R.A.J.*, 1999 UT App 329, ¶ 7, 991 P.2d 1118 (quotations and citations omitted). Second, the court must determine that it is in the child's best interest to terminate the parent's parental rights. *See id.;* Utah Code Ann. §§ 78–3a–402(2), –406(3) (1996). In termination of parental rights proceedings, "the court shall ... require the petitioner to establish the facts by clear and convincing evidence." Utah Code Ann. § 78–3a–406(3); *see also Santosky v. Kramer*, 455 U.S. 745, 747–48, 102 S.Ct. 1388, 1391–92, 71 L.Ed.2d 599 (1982) ("Before a State may sever completely and irrevocably the rights of parents in their natural child, due process requires that the State support its allegations by at least clear and convincing evidence."). Thus, we agree that the State had the burden of proving the allegation in its petition by clear and convincing evidence. However, "we conclude [that] the facts before the court were sufficient to meet the statutory requirement." *In re E.K.*, 913 P.2d 771, 775 (Utah Ct.App.1996).

■ ¶ 21 To support its allegations, the State provided documentation reflecting the adjudicated facts from the prior juvenile court proceedings involving Mother's neglect of J.B.'s older siblings. These include Mother's admission to the findings that one of the children was an abused child, as she was sexually abused by an out of the home perpe-

trator; the male siblings were at risk of being abused since they resided in the same home; there was every indication that the parents would not protect the children; out-of-home placement of the children was necessary until the parents could acknowledge that the abuse occurred and properly deal with the effects; a male sibling had been sexually abused and had not received therapy to address those issues; this same male child perpetrated abuse on the female child who was also in need of therapy; all the children were dependent or neglected; the physical conditions in the home have been unsanitary and the parents required assistance in maintaining their home; and, in spite of services provided, the children in the home were at risk due to the parents' repeated failure to follow through with services needed and suggested by DCFS.

■ ¶ 22 In addition to these adjudicated facts, Mother, the father, their friend B.R., who had schemed with the parents to conceal the birth of J.B., and three DCFS workers testified at the termination trial regarding J.B. We conclude that the "State introduced sufficient evidence to establish the elements of a prima facie case." *Id.* It then became Mother's burden to produce evidence to "persuade the court that the State had not established by clear and convincing evidence that [J.B.] was a neglected child because he was at risk of being [neglected or] abused." *Id.* Mother failed to present any such evidence, including rebuttal of judicially noticed prior adjudicated facts, and there was clear and convincing evidence before the juvenile court to support its determination to terminate Mother's parental rights to J.B.

■ ¶ 23 Next, Mother claims that the juvenile court failed to consider the requirements of Utah Code Ann. § 78–3a–409.

The statute requires courts, in determining whether parental rights should be terminated, to consider the reunification services offered; the children's physical, mental, and emotional condition and needs; and the parent's efforts to change conduct, conditions, or circumstances to make it in their children's best interest to return home.

*In re S.T.*, 928 P.2d 393, 400 (Utah Ct.App. 1996). Although "the juvenile court did not expressly refer to the statute when considering these factors," it is clear from the detailed findings that the court did consider the requirements set forth in this section when making its final determination. *Id.* We therefore conclude that prior to terminating Mother's parental rights, "the juvenile court properly considered each statutory factor." *Id.*

### CONCLUSION

¶ 24 It was proper for the juvenile court to take judicial notice of the prior adjudicated facts. Because the record reflects no substantial changes in Mother's circumstances, and based on the minimal amount of time that elapsed between the first termination proceeding and the second, the juvenile court's conclusion that J.B. was at risk was correct. We thus conclude that the State met its burden, and the juvenile court's decision was supported by clear and convincing evidence.

¶ 25 The juvenile court's order terminating Mother's parental rights is affirmed.

¶ 26 WE CONCUR: JUDITH M. BILLINGS, Associate Presiding Judge and PAMELA T. GREENWOOD, Judge.